1  CLAUDIA G. SILVA, County Counsel (SBN 167868)
   By: AUSTIN M. UHLER, Senior Deputy (SBN 319684)
2  Office of County Counsel, County of San Diego
   1600 Pacific Highway, Room 355
3  San Diego, California 92101-2469
   Telephone: (619) 318-7865
4  Email: austin.uhler@sdcounty.ca.gov

5  Attorneys for Defendants County of San Diego and
   Board of Supervisors of County of San Diego

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  HP COMMUNICATIONS, INC.,                    )  No. 23-cv-00844-JO-BLM
                                                )
12                          Plaintiff,          )  **DEFENDANTS' MEMORANDUM OF**
                                                )  **POINTS AND AUTHORITIES IN**
13            v.                                )  **SUPPORT OF MOTION FOR**
                                                )  **SUMMARY JUDGMENT, OR**
14  COUNTY OF SAN DIEGO. BOARD OF               )  **ALTERNATIVELY, PARTIAL**
    SUPERVISORS OF COUNTY OF SAN                )  **SUMMARY JUDGMENT**
15  DIEGO, and DOES 1-20,                       )
                                                )  Date:              September 11, 2025
16                          Defendants.         )  Time:              9:30 a.m.
                                                )  Courtroom:         4C
17                                              )  District Judge:    Hon. Jinsook Ohta
                                                )  Magistrate Judge:  Hon. Barbara Lynn
18                                              )                     Major
                                                )
19  _____)

20

21

22

23

24

25

26

27

28

                                                            23-cv-00844-JO-BLM

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................... 1

II. SUMMARY OF UNDISPUTED FACTS .................................................. 3

    A.  The Ordinance's Development and Adoption ............................... 3

    B.  The Ordinance's Key Features ..................................................... 4

    C.  The Ordinance's Enforcement and Interpretation ....................... 5

    D.  The Ordinance's Effects .............................................................. 6

        1.  Effects on Plaintiff ........................................................... 6

        2.  Effects on Traffic-Control Companies ............................. 8

            a.  West Coast Traffic Control, LLC ............................ 8

            b.  North County Traffic Control, Inc ........................... 8

            c.  Pro Traffic Services, Inc ......................................... 9

            d.  ACME Safety & Supply Corp .................................. 9

            e.  Co's Traffic Control, Inc ....................................... 10

        3.  Effects on Collective Bargaining ................................... 10

            a.  AGC Master Labor Agreements ............................ 10

            b.  Other CBAs Covering Certain Public Utility Work .......... 12

III. LEGAL STANDARD ............................................................................ 13

IV. ARGUMENT ......................................................................................... 15

    A.  The "*Machinists*" Preemption Doctrine Has Been
Developed to Protect Collective Bargaining from
Direct Interference .................................................................... 15

    B.  Plaintiff Lacks Standing to Bring Its Claim Because It
Has No Interest in the Collective-Bargaining Process ............ 17

    C.  The Ordinance Is Valid Because All County Actions Taken
under It Are Proprietary Activities with Respect to County
Land ........................................................................................... 19

23-cv-00844-JO-BLM

D.    The Ordinance is Valid Because It Is a Minimum Labor
        Standard ...................................................................................22

        1.    The Ordinance Affects Worker Compensation in the
                Same Way Traditional Minimum-Wage Laws Do ........................22

        2.    The Ordinance Has Not Discernably Affected the
                Process of Collective Bargaining ...................................................23

        3.    *Bragdon* Does Not Control the Outcome of This Case ................24

        4.    If *Bragdon* Does Control the Outcome of This Case,
                then It Should Be Overruled ..........................................................25

V.    CONCLUSION ...................................................................................25

23-cv-00844-JO-BLM

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Airline Service Providers Association v. Los Angeles World Airports*,
  873 F.3d 1074 (9th Cir. 2017) ................................................................. 20

*American Hotel and Lodging Association v. City of Los Angeles*,
  834 F.3d 958 (9th Cir. 2016) ........................................................ 16, 22, 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................. 13, 14

*Associated Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*,
  231 F. Supp. 3d 810 (S.D. Cal. 2017) ...................................................... 25

*Associated Builders and Contractors of Southern California, Inc. v. Nunn*,
  356 F.3d 979 (9th Cir. 2004) ............................................................... 24, 25

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders &*
  *Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993) .............. 15, 19

*Building Industry Electrical Contractors Association v. City of New York*,
  678 F.3d 184 (2d Cir. 2012) ......................................................... *passim*

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Texas*,
  180 F.3d 686 (5th Cir. 1999) .................................................................. 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................. 14

*Chamber of Commerce of United States v. Bragdon*,
  64 F.3d 497 (1995) ....................................................................... *passim*

*Concerned Home Care Providers, Inc. v. Cuomo*,
  783 F.3d 77 (2d Cir. 2015) ..................................................................... 24

*Fort Halifax Packing Co., Inc. v Coyne*,
  482 U.S. 1 (1987) ............................................................................. 16, 22

*Gasaway v. Northwestern Mutual Life Insurance Co.*,
  26 F.3d 957 (9th Cir. 1994) .................................................................... 14

*Jama v. Golden Gate America LLC*,
  No. C16-0611RSL, 2016 WL 8738670 (W.D. Wash. Dec. 13, 2016) ............ 18, 19, 25

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ........................................................................... 17-18

*Lodge 76 International Association of Machinists and Aerospace Workers,*
  *AFL-CIO v. Wisconsin Employment Relations Commission* (*"Machinists"*),
  427 U.S. 132 (1976) ........................................................................ 15, 16

iv

## TABLE OF AUTHORITIES
### (Continued)

**CASES**                                                                    **PAGE(S)**

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................ 14

*Metro Life Insurance Co. v. Massachusetts*,
  471 U.S. 724 (1985) ................................................... 16, 18, 22

*New York Telephone Co. v. New York Department of Labor*,
  440 U.S. 519 (1979) ................................................................ 15

*National Labor Relations Board v. Noel Canning*,
  573 U.S. 513 (2014) ................................................................ 22

*Ray Charles Foundation v. Robinson*,
  795 F.3d 1109 (9th Cir. 2015) ............................................... 17

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*,
  583 F.3d 716 (9th Cir. 2009) ................................................. 21

*Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*,
  368 F.3d 1053 (9th Cir. 2004) ............................................... 17

*TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*,
  913 F.2d 676 (9th Cir. 1990) ................................................. 14

*Witherow v. Paff*,
  52 F.3d 264 (9th Cir. 1995) ................................................... 14

**STATUTES AND OTHER AUTHORITIES**

California Public Utilities Code
  § 7901 ...................................................................................... 21

  § 7901.1 ................................................................................... 21

California Labor Code
  § 1720 ........................................................................................ 4

California Streets and Highways Code
  § 941 .......................................................................................... 4

  § 1460 ...................................................................................... 21

  § 1461 ...................................................................................... 21

Federal Practice and Procedure (Wright & Miller)
  § 2725 ...................................................................................... 14

Federal Rules of Civil Procedure
  Rule 56(a) ................................................................................ 13

v

23-cv-00844-JO-BLM

# I.

# INTRODUCTION

In 2023, the County Board of Supervisors adopted an Ordinance boosting compensation for traffic-control workers performing work on County-maintained roads. The Board ordained that its purpose was to address the unique safety risks of construction on these roads by ensuring that the most qualified traffic-control workers are retained to perform the work there. The Ordinance requires that persons who encroach on these roads pay their traffic-control workers minimum compensation at least equal to the "prevailing wage" applicable to traffic-control work as determined by the California Department of Industrial Relations. A Board Letter explained that it was essential that the workers entrusted with keeping these roads safe be paid a wage that attracts high-quality workers.

Plaintiff, a telecom-construction contractor, promptly filed this lawsuit challenging the Ordinance. Its sole claim is that the Ordinance is preempted by the National Labor Relations Act ("NLRA") because, it alleges, the Ordinance's incorporation of a prevailing-wage concept interferes too much in the process of collective bargaining. The claim has superficial support from the Ninth Circuit's decision in *Chamber of Commerce of United States v. Bragdon*, 64 F.3d 497 (1995). There, three decades ago, a panel of the Ninth Circuit held that the NLRA preempted a Contra Costa County ordinance that had required prevailing wages be paid to workers on large private construction projects. However, the undisputed facts in this case show that it is distinguishable from *Bragdon* in three crucial respects, each of which entitles the County to judgment as a matter of law.

First, the undisputed facts show that, unlike the Chamber of Commerce in *Bragdon*, whose members included businesses directly engaged in collective bargaining, Plaintiff has never engaged in collective bargaining and considers the times when it has paid wages determined by the collective bargaining of others to have been mere "union shakedowns." Plaintiff therefore cannot assert an NLRA preemption claim under the prudential standing doctrine. Its claim is not based on its own rights to collectively

23-cv-00844-JO-BLM

bargain but rather on the rights of other parties who do, and its expressed interest in not paying higher wages for traffic-control work on County-maintained roads is not even arguably within the zone of interests protected by the NLRA.

Second, the undisputed facts show that the proprietary-activity exception applies. This exception recognizes that the NLRA does not preempt the government from acting as a private property owner would act, even if doing so would incidentally affect labor relations. Unlike in *Bragdon*, where that county had required certain wages be paid for work performed on construction projects on private land, here the County requires certain wages be paid for work performed *only on land where the County has property rights to control and maintain the land for use as a public road*. The County is similar to private-property owners in that it has both the legal right to decide and legal responsibility for deciding what rules people must follow on the property to keep the property safe. It made a considered decision to require encroachers to pay wages sufficient to attract well qualified workers to perform traffic-control work there, which is exactly how one might expect a private-property owner who places a high value on safety to act. This proprietary activity is excepted from NLRA preemption.

Finally, the undisputed facts show that the exception for minimum labor standards applies. This exception recognizes that the NLRA does not preempt local government's traditional authority to set minimum labor standards appropriate to local conditions. The Ordinance requires a minimum value of total hourly compensation but—unlike the ordinance in *Bragdon*—allows parties to bargain freely over how to reach or exceed that value as between direct money wages and various kinds of fringe benefits. That is the effect of its requirement that a wage *equivalent* (i.e., of equal value) to the prevailing wage be paid, rather than requiring that *the* prevailing wage be paid, and that is what has happened in practice. Further, in practice, parties who collectively bargained pre-Ordinance have continued to do so post-Ordinance with no discernable effect on the process. The NLRA does not preempt this kind of minimum labor standard.

///

23-cv-00844-JO-BLM

For these reasons, there is no genuine dispute as to the facts that are material to Plaintiff's NLRA preemption claim, and the County is entitled to judgment as a matter of law. Summary judgment should be entered in favor of Defendants.

## II.

## SUMMARY OF UNDISPUTED FACTS

## A.    The Ordinance's Development and Adoption

On September 14, 2022, the Board of Supervisors of the County of San Diego directed County staff to perform public outreach and develop an ordinance that would require a minimum wage for traffic-control workers doing work in the County right-of-way equal to or greater than the prevailing wage for such work set by the California Department of Industrial Relations ("DIR"). *See* Ex. A, Board Minute Order No. 5, Minutes of Proceedings on Sept. 14, 2022.

At that Board meeting, the Director of Government Affairs of the local chapter of the Laborers International Union of North America offered public comments stating that the requirement would "ensure keeping a high quality workforce engaged." Ex. B-1, Video Recording of Sept. 14, 2022 Board Meeting at 00:24-00:28; Ex. B-2, Transcript of Sept. 14, 2022 Board Meeting at 3:13-14. He offered his union's "observ[ation] that companies and contractors that need to access the public right of way do not pay traffic control workers an adequate wage . . . [and] have been known to pay workers minimum wage or close to it" in a "market [that] has created and encouraged a race to the bottom." Ex. B-1, Video Recording at 00:31-00:43, 00:52-00:56; Ex. B-2, Transcript at 3:15-19, 3:24-25.

The ordinance developed by County staff after conducting public outreach was returned to the Board for its first and second readings on January 25 and February 8, 2023, respectively, as Ordinance number 10828 (the "Ordinance"). A Board Letter regarding the Ordinance stated that it was "essential that [traffic-control] work is performed by a workforce that is well-trained and paid a wage that attracts high-quality workers." Ex. C, Board Letter dated Jan. 25, 2023, and Feb. 8, 2023, at 6. On February 8,

23-cv-00844-JO-BLM

2023, the Ordinance was adopted by a 4-1 vote of the Board. *See* Ex. D, Board Minute Order No. 1, Minutes of Proceedings on Feb. 8, 2023.

**B.    The Ordinance's Key Features**

The Ordinance generally requires that persons encroaching on County-maintained roads pay their traffic-control workers compensation at least equivalent to the prevailing wage set by the California DIR for the same kind of work. Specifically, it provides:

> All Traffic Control Workers providing traffic control work to stop, slow, or direct traffic on a Highway, except if engaged on a Small Project, shall be paid *a wage equivalent to the Prevailing Wage* otherwise owed to persons engaged on a public works or maintenance project for the same or substantially similar work.

Ex. E, Ordinance at 2 (§ 2(b)) (emphasis added).

It fine-tunes the scope of its application by using specially defined terms:

- "Traffic Control Workers" are "person[s] engaged in stopping, slowing, or directing traffic through a construction site or other portion of a Highway subject to a disruption in travel," except for any "public agency employee engaged in traffic control for the public agency." *Id.* at 2 (§ 2(a)(iv)).
- A "Highway" is a road officially maintained by the County, specifically "the entire width of a street dedicated to public use and accepted into the system of streets maintained by the County of San Diego in accordance with [California] Streets & Highways Code section 941." *Id.* at 2 (§ 2(a)(i)).
- "Prevailing Wage" is defined by reference to state law and means "the wage required by [California] Labor Code section 1720 et seq. to be paid to a worker on a public works or maintenance project in the location where the work is performed." *Id.* at 2 (§ 2(a)(ii)).

The Ordinance also provides that the wage requirement be deemed a mandatory term of all County-issued permits to do work needing traffic control, stating, "Any permit or approval issued by the County . . . to perform work within a Highway that requires the use of a Traffic Control Worker shall be deemed to include the requirement to pay the wage specified by Subsection (b) [i.e., a wage equivalent to the prevailing wage]." *Id.* at

4

2 (§ 2(c)); *see also* Ex. F, Deposition of Ahmad Olomi, Executive Vice President of Plaintiff HP Communications, Inc. ("Olomi Depo.") at 78:2, 78:5-6 ("it's an attachment to a permit . . . when [contractors] receive a permit, it requires them to sort of comply with the prevailing wage").

## C.    The Ordinance's Enforcement and Interpretation

The County enforces the Ordinance in a "complaint-based" way. Declaration of Branden Butler ¶ 5; Ex. G, Deposition of Branden Butler, Person Most Knowledgeable for County of San Diego, dated Dec. 19, 2024 ("Butler Depo.") at 27:23. It neither conducts nor plans to conduct periodic audits of contractors' payroll records under the Ordinance. *See* Butler Decl. ¶ 5; Ex. G, Butler Depo. at 26:24-27:23. Although it may require contractors to furnish payroll records in specific instances when investigating a complaint, it does not generally require contractors to submit certified payroll records to it or to anyone else. *See* Butler Decl. ¶ 6; *cf.* Ex. H, Deposition of Janet Andrews, Person Most Knowledgeable of Pro Traffic Services, Inc., dated Feb. 26, 2025 ("Andrews Depo.") at 31:25-32:1 ("We do not prepare certified payroll . . . for this ordinance, no.").

The County helps contractors understand how to comply with the Ordinance by providing general information on its website and in the form of a one-page "frequently asked questions" ("FAQ") document, which the County periodically updates. *See* Butler Decl. ¶ 4; Ex. G, Butler Depo. at 15:25; Ex. I, Right-of-Way Done Right FAQ.[1] The County's educational efforts appear to have been successful because, in practice, the County has not received any complaints of non-compliance with the Ordinance. *See* Butler Decl. ¶ 7; Ex. G, Butler Depo. at 27:24-28:2.

Although the County has not had any occasion to enforce the Ordinance, it has interpreted the Ordinance consistently over time. Since it adopted the Ordinance, it has always interpreted the Ordinance's phrase "wage equivalent to the Prevailing Wage" to mean total hourly compensation that, adding together the value of all its components

---

[1] The most recently updated "Right-of-Way Done Right FAQ" is available online at https://www.sandiegocounty.gov/content/sdc/OLSE/right-of-way-done-right.html (last accessed June 2, 2025).

23-cv-00844-JO-BLM

(including the base rate of money wages and all kinds of fringe benefits), equals the total hourly prevailing-wage rate determined by California's DIR. *See* Butler Decl. ¶ 8. The County has never interpreted the Ordinance to require that the base money-wage component of the DIR's prevailing-wage calculation be paid directly to the worker. *See id.* ¶ 9. Instead, the County has always interpreted the Ordinance to allow contractors to pay more or less toward the base money-wage component than California calculates for that component, so long as the total compensation provided is equal to the total prevailing-wage rate. *See id.*

Finally, the County has always interpreted the Ordinance to set a minimum wage, as opposed to a fixed wage, so as not to penalize any contractor who wants to pay its traffic-control workers more. *See id.* ¶ 10. The County's FAQ is consistent:

> [T]he Board directed the Chief Administrative Officer to develop and return with an ordinance that codifies a *minimum wage* for traffic control workers . . . doing work on County of San Diego-maintained roads *equal to or greater than* the prevailing wage that is set by the Department of Industrial Relations in the State of California for traffic control on public works projects.

Ex. I, Right-of-Way Done Right FAQ (emphases added).

Permits to encroach on County-maintained roads are issued by the County's Department of Public Works. *See* Ex. J, Deposition of Murali Pasumarthi, Person Most Knowledgeable for County of San Diego, dated Mar. 4, 2025 ("Pasumarthi Depo.") at 8:18-9:1, 34:5-21. The umbrella permit that covers all sorts of activities that might take place in County-maintained roads is called an "encroachment permit." *Id.* at 34:18. There are also permits for more specific activities, such as excavation and traffic control. *See id.* at 34:11-16. All permits to perform work requiring traffic-control workers are deemed to include the Ordinance's wage requirement. *See id.* at 36:2-11.

**D.    The Ordinance's Effects**

**1.    Effects on Plaintiff**

Plaintiff HP Communications, Inc. is a construction contractor in the telecom industry. *See* Dkt. 1, Complaint ¶ 2. It has paid the wage required by the Ordinance. *See*

23-cv-00844-JO-BLM

Ex. F, Olomi Depo. at 166:23-167:3. It understands that the Ordinance applies only to roads over which the County has permitting and maintenance authority. *See id.* at 89:15-21. It pays its own employees substantially more for performing traffic-control work where the Ordinance applies than where it does not. *See id.* at 46:1-7. But after the Ordinance was adopted, Plaintiff has in fact outsourced most of its traffic-control needs, except for a very small number of times, to dedicated traffic-control companies. *See id.* at 51:20-25, 69:4-6. It pays its own employees the wages required by the Ordinance only "on a very limited basis," because covered traffic-control work by its in-house employees is now "[m]inimal." *Id.* at 69:7, 71:18.

Although Plaintiff contends that the Ordinance is preempted because it interferes too much in the collective-bargaining process, Plaintiff's stated concerns do not specifically relate to any effects the Ordinance might have on collective bargaining. Plaintiff's stated concerns rather specifically relate to the fact that the Ordinance requires payment of wages for traffic-control work that are much higher than Plaintiff wants to pay. *See id.* at 173:20-174:2; *see also id.* at 173:25-174:2 ("[I]f the ordinance said minimum wage, but the rate is still the same rate that the prevailing wage is, yes, we would have the same concerns.").

Plaintiff is simply not involved in collective bargaining. Plaintiff is a "non-union contractor." *Id.* at 98:10. It does not have any collective bargaining agreement ("CBA") with any local union office and has never negotiated one. *See id.* at 98:10-12, 99:6-8.[2] It does not negotiate wage rates and has not otherwise bargained with any unions. *See id.* at 162:23-163:2, 169:3-12. It has never even had to pay wages that were determined by the collective bargaining of others except pursuant to two Project Labor Agreements ("PLAs"). *See id.* at 99:2-5.[3]

---

[2] A "collective bargaining agreement" is generally defined as a "contract between an employer and a labor union regulating employment conditions, wages, benefits, and grievances." COLLECTIVE-BARGAINING AGREEMENT, Black's Law Dictionary (12th ed. 2024).

[3] A "project labor agreement" is a "large-scale contract[] common in the construction industry," which "typically select[s] a union to represent workers on a project and are often signed before construction begins." *Bldg. Indus. Elec. Contractors*

7

But even in those two instances, it did not negotiate the terms of the PLAs. *See id.* at 132:4-6; *see also id.* at 131:25-132:3 ("I mean, again, it was a shakedown by the union just to sign up so they can collect their dues and other payments that we're required to pay. That was about it. It's nothing more than that."). And even when negotiations did occur over the wages and benefits that Plaintiff was required to provide under one of its PLAs, Plaintiff did not participate in the negotiations. *See id.* at 137:22-138:6. Finally, although it evaluates whether to enter into PLAs on a case-by-case basis, it has actually never sought out any PLA on its own initiative. *See id.* at 139:5-22.

### 2.    Effects on Traffic-Control Companies

Dedicated traffic-control companies have also boosted compensation to their workers to comply with the Ordinance. The five companies described below operate in San Diego County and together employ a total of approximately 228 to 308 traffic-control workers.

#### a.    *West Coast Traffic Control, LLC*

Like Plaintiff, West Coast Traffic Control, LLC, is non-union. It employs nine traffic-control workers, and none of them are members of any union. *See* Ex. K, Deposition of Kyle Abney, Person Most Knowledgeable for West Coast Traffic Control, LLC, dated Feb. 25, 2025, at 15:25-16:8. It generally determines how much compensation to offer its workers based on their experience in the field and whether they are a good fit with the company. *See id.* at 10:22-11:8. It pays a higher wage to its traffic-control employees where the Ordinance applies than where it does not. *See id.* at 17:2-14. It also pays more for fringe benefits like health and pension for such employees where the Ordinance applies than where it does not. *See id.* at 19:15-20:6.

#### b.    *North County Traffic Control, Inc.*

North County Traffic Control, Inc. is also non-union. *See* Ex. L, Deposition of Annette Requilman, Person Most Knowledgeable for North County Traffic Control, Inc., dated Feb. 27, 2025, at 16:6-13. It employs approximately twenty-six traffic-control

---

*Ass'n v. City of New York*, 678 F.3d 184, 185 (2d Cir. 2012).

23-cv-00844-JO-BLM

technicians, most of whom are part-time employees. *See id.* at 15:19-16:3. It generally determines how much compensation to offer its traffic-control employees based on their work experience and where their work experience falls within a range of pay determined by its management's industry experience. *See id.* at 19:9-18. It pays a higher hourly rate of compensation to them where the Ordinance applies than where it does not. *See id.* at 16:15-21. In paying a higher hourly rate, it both pays more in base money wages and also more in contributions to the 401(k) accounts it provides to its employees. *See id.* at 18:11-15. Otherwise, the Ordinance has no effect on the compensation it provides to its employees. *See id.* at 16:22-25, 20:12-14 ("[W]e set our wages for the regular rates of pay without consideration to the prevailing wage.").

             c.     *Pro Traffic Services, Inc.*

Pro Traffic Services, Inc., in contrast, is a union company. It is signatory to a CBA with Local 47 of the International Brotherhood of Electrical Workers ("IBEW"). *See* Ex. H, Andrews Depo. at 37:22-38:2; Ex. M, Southern California Outside Utility Infrastructure Agreement. And it hires its traffic control employees exclusively from IBEW Local 47. *See* Ex. H, Andrews Depo. at 15:20-16:10. It has between sixty-five to 145 such employees, nearly all of whom work full-time. *See id.* at 22:20-23:22 (estimating a total of eighty to 160 employees, of which approximately fifteen are office employees). As a result of the Ordinance, it "ha[s] to pay them higher." *Id.* at 27:21-22. When the Ordinance applies, it makes the same payment to the union for the workers' fringe benefit package as it makes when the Ordinance does not apply. *See id.* at 28:8-19, 30:22-31:5. And where the applicable prevailing wage calculation includes categories of fringe benefits that are neither required by IBEW Local 47 nor offered by Pro Traffic, Pro Traffic pays directly to the worker additional money wages to cover the difference. *See id.* at 32:23-33:20.

             d.     *ACME Safety & Supply Corp.*

ACME Safety & Supply Corp. is also a union company. The compensation it generally pays to its traffic-control technicians is set by Local 89 of the Laborers

9

International Union of North America. *See* Ex. N, Deposition of Daniel Friedman, Person Most Knowledgeable for ACME Safety and Supply Corp., dated Feb. 26, 2025, at 12:10-25. ACME employs thirty-eight traffic-control workers. *See id.* at 17:18-20. It pays these workers approximately $20 to $40 more per hour where the Ordinance applies than where the Ordinance does not apply. *See id.* at 23:17-25. It also makes larger contributions to its workers' fringe-benefit package where the Ordinance applies than where the Ordinance does not apply, paying, for example, $3 per hour toward a worker's vacation benefit where the Ordinance applies as opposed to $1.50 per hour where the Ordinance does not apply. *See id.* at 29:19-30:5.

### e.    *Co's Traffic Control, Inc.*

Finally, Co's Traffic Control, Inc. is also a union company that, like Pro Traffic, is affiliated with IBEW Local 47. *See* Ex. O, Deposition of Marlene Sanchez, Person Most Knowledgeable for Co's Traffic Control, dated Feb. 25, 2025, 16:7-12. It determines how much to compensate its traffic control workers based on what the union requires, and sometimes its owner will also increase a worker's pay based on the worker's demonstrated performance or experience. *See id.* at 11:14-19, 22:2-16. It employs approximately ninety traffic-control workers, most of whom are full-time employees. *See id.* at 15:2-9. Where the Ordinance applies, it pays them their normal union rate and fringe benefits, plus an additional amount of money wages directly to the workers. *See id.* at 17:14-18:5, 35:11-17. After the Ordinance was adopted, it has not reduced the value of fringe benefits it offers to its employees. *See id.* at 18:25-20:10.

### 3.    Effects on Collective Bargaining

#### a.    *AGC Master Labor Agreements*

Certain so-called Master Labor Agreements for Building and Engineering Construction govern the terms and conditions of some portion of the traffic-control work performed in San Diego County. *See* Ex. P, Deposition of Jim Ryan, Person Most Knowledgeable for Associated General Contractors, San Diego Chapter, Inc. ("AGC of San Diego"), dated Mar. 5, 2025, at 20:11-22:5 ("Ryan Depo."); Ex. Q, AGC Master

23-cv-00844-JO-BLM

Labor Agreement for Building Construction at 37 (covering "Flagman" or "Traffic Control by any method"); Ex. R, AGC Master Labor Agreement for Engineering Construction at 39-40 (same but for engineering-construction work as opposed to building-construction work).

These Master Labor Agreements have been in place and continually negotiated for decades between the AGC of San Diego, on the one hand, and the Southern California District Council of Laborers for San Diego County, on the other. *See* Ex. P, Ryan Depo. at 20:1-10; Ex. S, Deposition of Valentine Macedo, dated Mar. 14, 2025 ("Macedo Depo.") at 28:24-29:3. The total hourly compensation received by a traffic-control worker covered by one of these two Master Labor Agreements is generally determined by adding together: (1) a base hourly wage, which is set forth in one part of the agreements; (2) a package of fringe benefits, which is set forth in another part of the agreements; and (3) a certain predetermined incremental amount per year that can be allocated by the relevant union as it wishes to increase wages or benefits. *See* Ex. P, Ryan Depo. at 28:17-29:1, 43:19-44:18.

AGC of San Diego is a large trade association with approximately 1,000 member firms. *See* Ex. P, Ryan Depo. at 14:7, 16:19-17:1. Among other things, it "represents the construction industry . . . in labor relations." *Id.* at 14:9-11. And as relevant here, it represents certain of its member contractors in negotiating and administering the Master Labor Agreements for Building and Engineering Construction. *See id.* at 17:8-19. The Southern California District Council of Laborers is part of the intermediate tier of organization of the Laborers International Union of North America, and sits above, as relevant here, Local 89 of that same union. *See* Ex. S, Macedo Depo. at 28:16-23. In San Diego County, Local 89 has nearly 5,000 members, of which the majority of new members since 2004 have gone through its training programs and are trained to perform traffic-control work. *See id.* at 26:7-23.

The process of collective bargaining over these two Master Labor Agreements has usually been as follows. Sixty to ninety days before an agreement expires, at least one

23-cv-00844-JO-BLM

side sends a letter to the other stating that it wants to open the agreement for negotiations. *See* Ex. P, Ryan Depo. at 35:13-22. Then the two sides meet and present their proposals to each other. *See id.* at 35:23-36:5. They meet in person, and there are approximately four to seven people on bargaining committees representing each side. *See id.* at 36:13-24; Ex. S, Macedo Depo. at 32:21-33:6. The two sides discuss the proposals, "and as time goes on, each side drops some, if not all of their proposals, and then the ones that are left become part of the agreement." Ex. P, Ryan Depo. at 36:2-5. Then wages and the term of the agreement, typically between one and four years, are negotiated back and forth until both sides agree. *See id.* at 36:6-11; Ex. S, Macedo Depo at 32:12-16. It typically takes approximately five to ten meetings to negotiate a Master Labor Agreement, although it could be more or less in any particular case. *See* Ex. P, Ryan Depo. at 37:8-14.

The Ordinance has not impacted the process of collective bargaining over the Master Labor Agreements. Both relevant Master Labor Agreements were last negotiated in the first half of 2022 (i.e., before the Board first suggested the idea of the Ordinance in September 2022). *See id.* at 37:21-38:1. And the current Master Labor Agreements do not expire until June 30, 2026. *See* Ex. Q at 2; Ex. R at 3. The lead negotiator for AGC of San Diego was not aware of and did not hear mention of any proposed traffic-control-worker ordinance from anyone involved in the 2022 negotiations. *See* Ex. P, Ryan Depo. at 37:21-38:11. He has also not heard any mention of the Ordinance in connection with the anticipated 2026 negotiations. *See id.* at 38:12-16. The current Master Labor Agreements have not been modified since they became effective in 2022, and a committee authorized under one of them to recommend modifications that may be in the best interests of both sides (*see* Ex. R at 1-2) has never met. *See* Ex. P, Ryan Depo. at 40:5-18.

                       b.   *Other CBAs Covering Certain Public Utility Work*

Other CBAs, negotiated separately from the AGC Master Labor Agreements, govern traffic-control work related to certain public utilities like SDG&E. *See* Ex. P, Ryan Depo. at 23:15-24:5; Ex. S, Macedo Depo. at 35:4-15. For example, Pro Traffic

23-cv-00844-JO-BLM

participated in negotiations with IBEW Local 47 that led to the CBA to which it is signatory (see Ex. M, Southern California Outside Utility Infrastructure Agreement), sending two representatives to attend multiple negotiation meetings in 2022. *See* Ex. H, Andrews Depo. at 34:17-35:6, 36:6-11. However, the Ordinance has not had any observable effect on this CBA either: no one mentioned it during these meetings, and the CBA will probably not be negotiated again until 2027. *See id.* at 36:12-17.

Finally, SDG&E and IBEW Local 465, who are party to a CBA with each other that covers certain traffic-control work, entered into two Letters of Understanding ("LOUs") in 2023 related in part to SDG&E's efforts to comply with the Ordinance. *See* Ex. T, Letters of Understanding, dated Oct. 9, 2023. One LOU related to retroactive compliance and the other to prospective compliance. *See id.* at 1-12 (retroactive), 13-23 (prospective). Both LOUs increased worker pay, the former by a lump-sum retroactive payment, and the latter by establishing higher wages and a new system for tracking traffic control on roads where the Ordinance and other similar requirements apply. *See id.* at 2-3, 14-16. Neither LOU decreased fringe benefits of any kind. *See generally id.* The former LOU states, "The Company and the Union recognize that this LOU is a reflection of good faith and best efforts to comply with the Ordinance. The Company and Union further . . . agree to continue to partner and work cooperatively." *Id.* at 4. The latter LOU states, "The Company and the Union recognize that there may be other issues that arise in connection with compliance . . . and agree to continue to partner and work cooperatively." *Id.* at 16-17.

## III.

## LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about such a fact "is 'genuine' . . . if the evidence is such that a

23-cv-00844-JO-BLM

reasonable jury could return a verdict for the nonmoving party." *Id.* "If no such issue exists, the rule permits the immediate entry of judgment." 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725 (4th ed. Apr. 2025 update). "Moreover, where the ultimate fact in dispute is destined for decision by the court rather than by a jury, there is no reason why the court and the parties should go through the motions of a trial if the court will eventually end up deciding on the same record." *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 684 (9th Cir. 1990).

The moving party's initial burden on a summary-judgment motion is slight. It "bears the initial responsibility of informing the district court of the basis for its motion" and "identifying" the portions of the record that "demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 327. The moving party need not offer evidence "negating" the nonmoving party's case. *Id.* at 323.

Once the moving party meets its initial burden, the burden shifts to the nonmoving party to show that a genuine dispute of material fact exists. *See id.* at 322-24. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further, "if the factual context renders . . . [the] claim implausible—if the claim is one that simply makes no economic sense—[the nonmoving party] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.* at 587. "Mere allegation and speculation do not suffice. *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam). The nonmoving party must "produce evidence sufficient to support a jury verdict in her favor." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 959 (9th Cir. 1994). This requires the nonmoving party to "go beyond the pleadings" and by declarations, depositions, or written discovery materials, identify specific facts showing a genuine dispute. *Celotex*, 477 U.S. at 324.

14

## IV.

## ARGUMENT

In this case, there is no genuine dispute that (1) Plaintiff lacks prudential standing to assert its sole preemption claim, (2) the exception to preemption for proprietary activity applies, and (3) the exception to preemption for minimum labor standards applies. To see why, it is essential to first establish the nature of Plaintiff's preemption claim.

### A.   The "*Machinists*" Preemption Doctrine Has Been Developed to Protect Collective Bargaining from Direct Interference.

The NLRA does not contain an express preemption provision. In general, the Supreme Court is "reluctant to infer pre-emption." *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993). Yet "[t]he doctrine of labor law pre-emption" precisely "concerns the extent to which Congress has placed *implicit* limits on the permissible scope of state regulation of activity touching upon labor-management relations." *N.Y. Tel. Co. v. N.Y. Dep't of Labor*, 440 U.S. 519, 527 (1979) (emphasis added and internal quotation marks omitted). The Supreme Court's decision in *Lodge 76 International Association of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission ("Machinists")*, 427 U.S. 132, 138 (1976), clarified the NLRA's two distinct preemption doctrines and gave its name to the type of preemption— *Machinists* preemption—that Plaintiffs invoke in this case.

In *Machinists*, the Supreme Court held that the NLRA preempted Wisconsin from enforcing a state-court ruling ordering workers to stop their coordinated action to refuse to work overtime, because such coordinated labor action was a type of activity (which the Court variously referred to as economic self-help, economic pressure, or use of economic weapons) that Congress in passing the NLRA had intended *not* be regulable by the states. *See id.* at 148-51. The Court cited several of its own decisions and scholarly articles supporting its view that preemption can occur where a state law or action upsets the

23-cv-00844-JO-BLM

balance of power between labor and management by regulating activities that Congress meant to leave unregulated and controlled by the free play of economic forces. *See id.* at 140-48. This form of preemption is now called *Machinists* preemption.

A concurring opinion by Justice Powell, joined by Chief Justice Burger, however, expressed a qualification that was necessary to reach the majority 6-3 outcome in the case. *See id.* at 155-56. These Justices stated that they would join the opinion of the Court with the understanding that states can, without fear of preemption, enforce "neutral" laws and rules that are "not *directed toward* altering the bargaining positions of employers or unions but which may have an *incidental effect* on relative bargaining strength" of employers or unions. *Id.* at 156 (emphases added).

The concurrence's understanding—limiting *Machinists* preemption to state action that *directly* interferes with collective bargaining—has remained fundamental to the scope of the doctrine's application in later Supreme Court cases. *See Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747-58 (1985) (mental-health-insurance requirement not preempted); *Fort Halifax Packing Co., Inc. v Coyne*, 482 U.S. 1, 19-23 (1987) (severance-pay requirement not preempted). As the Ninth Circuit explained more recently, "minimum wages," for example, "technically interfere with labor-management relations and may impact labor or management unequally" but "are not preempted, because they do not regulate the mechanics of labor dispute resolution" and "merely provide the 'backdrop' for negotiations." *Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 963 (9th Cir. 2016) (internal citations and quotation marks omitted).

Nearly 20 years after *Machinists* was decided, the Ninth Circuit held that *Machinists* preemption applied to preempt a Contra Costa County prevailing-wage ordinance that interfered too directly with the collective-bargaining process. *Chamber of Commerce of U.S. v. Bragdon*, 64 F.3d 497 (1995). In *Bragdon*, the ordinance requiring prevailing wages for large private construction projects specifically interfered with the bargaining process in a too "invasive and detailed fashion" because it "affect[ed] . . . the *division* of the total [compensation] package that [wa]s paid in hourly wages directly to

16

the worker and the amount paid by the employer in health, pension, and welfare benefits." 64 F.3d at 502 (emphasis added). That ordinance required that the base money-wage component of the state's prevailing-wage calculation (as opposed to its various fringe-benefit components) "be paid directly to the worker." *Id.* The court stated that this specific requirement "would place considerable pressure on the contractor and its employees to revise the labor agreement to reduce the benefit package . . . in order to remain competitive," in essence dictating the results of collective bargaining and leaving nothing left to bargain over. *Id.*

As discussed below, the undisputed facts confirm that none of the essential features or rationales of these decisions are implicated by the Ordinance.

## B. **Plaintiff Lacks Standing to Bring Its Claim Because It Has No Interest in the Collective-Bargaining Process.**

As a threshold issue, Plaintiff lacks standing under the doctrine of prudential standing to assert its sole NLRA preemption claim because it does not engage in collective bargaining. "Prudential standing" is an umbrella term historically used to refer to a set of related prudential principles that limit federal courts' exercise of their jurisdiction or the right of particular plaintiffs to sue under particular laws. As relevant here, two key principles are that (1) a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"; and (2) "the interest sought to be protected by the complainant" must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118, 1120 (9th Cir. 2015).

Prudential-standing principles are both deeply useful and deeply rooted. The first principle, limiting third-party standing, "assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Id.* at 1119 (quoting *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1057 (9th Cir. 2004)). And the second principle is a "requirement of general application," *Lexmark*

23-cv-00844-JO-BLM

*International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)), whose "roots lie in the common-law rule that a plaintiff may not recover under the law of negligence for injuries caused by a violation of a statute unless the statute is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Id.* at 130 n.5 (internal quotation marks omitted).

Plaintiff runs afoul of both principles. First, it necessarily rests its claim on the legal rights and interests of third parties who engage in collective bargaining, because, as it admits, it has never engaged in collective bargaining. *See* Ex. F, Olomi Depo. at 98:10-12, 99:6-8. It specifically has not negotiated wage rates or otherwise bargained with any unions. *See id.* at 162:23-163:2, 169:3-12. It twice signed onto discrete, take-it-or-leave-it PLAs so that it could win certain projects. *See id.* at 132:4-6. But when negotiations took place over the terms that were incorporated into one of those PLAs, it did not engage in them. *See id.* at 137:22-138:6. And it has never proactively sought out any PLAs (*see id.* at 139:5-22), which it considers union "shakedown[s]." *Id.* at 131:25.

Second, its interests in filing this lawsuit are not even arguably within the zone of interests protected by the NLRA, the Supremacy Clause, or the *Machinists* doctrine. The NLRA, specifically in the context of the *Machinists* doctrine, has been interpreted to have the purposes of "equalizing bargaining power, raising depressed wages, lessening the gap between wages and profits, and/or avoiding overall economic decline and depression." *Jama v. Golden Gate America LLC*, No. C16-0611RSL, 2016 WL 8738670, at *4 (W.D. Wash. Dec. 13, 2016) (citing *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754-55 (1985)). Plaintiff's stated interests in not having to pay higher wages to its workers and in avoiding the problems it associates with having to pay higher wages to its workers are completely unrelated to collective bargaining. *See id.* at 46:1-17.[4] Indeed, when asked

---

[4] What is more, Plaintiff's stated interest in not paying higher wages is directly *opposed* to the NLRA's purpose of "lessening the gap between wages and profits." *Jama*, 2016 WL 8738670, at *4 (citing *Metro Life*, 471 U.S. at 754-55).

18

whether Plaintiff's concerns would be "exactly the same" if the ordinance had not included the prevailing-wage concept, Plaintiff's Executive Vice President admitted, "if the ordinance said minimum wage, but the rate [were] still the same rate that the prevailing wage is, yes, we would have the same concerns." *Id.* at 173:23, 173:25-174:2.

Accordingly, Plaintiff lacks prudential standing to assert a *Machinists* preemption claim because (1) it rests the claim solely on the legal rights and interests of third parties who engage in collective bargaining, and (2) its general interest in keeping down the cost of doing business is not even arguably within the zone of interests protected by the laws Plaintiff invokes.

## C.   The Ordinance Is Valid Because All County Actions Taken under It Are Proprietary Activities with Respect to County Land.

Plaintiff's sole preemption claim fails as a matter of law because preemption does not apply to the County's proprietary activity, meaning activity in its capacity as a property owner. Here, the undisputed facts show that all County actions under the Ordinance are taken in its capacity as the owner of property interests in the land where its roads are located.

As described above, not all government activity affecting labor relations is preempted by the NLRA. One formal exception to preemption is when "the government act[s] as a proprietor and participant in the market place." *Bragdon*, 64 F.3d at 501. "When a State owns and manages property, for example, it must interact with private participants in the market place." *Id.* (quoting *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 227 (1993)). In deciding how to manage its property and navigate these interactions, "the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." *Id.* (emphasis in original) (quoting *Bldg. & Const. Trades Council*, 507 U.S. at 227). In *Bragdon*, for example, the Ninth Circuit held that the county acted as a regulator by requiring that private employers pay to their employees on ///

19

23-cv-00844-JO-BLM

certain large private construction projects prevailing wages as determined by the California DIR. *See id.* at 498, 501.

In contrast, in *Airline Service Providers Association v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017), the Ninth Circuit held that the City of Los Angeles acted as a proprietor even though it had required airline-service companies to enter into so-called "labor peace agreements" that directly changed the mechanics of collective bargaining at the city-operated LAX airport. *See id.* at 1080-84. To reach this conclusion, the court applied the test first articulated in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686 (5th Cir. 1999). *See Airline Service Providers*, 873 F.3d at 1080. The test, put simply, asks two questions:

> (1)    Is the activity undertaken to efficiently procure needed goods and services, as one might expect of a private business in the same situation?
>
> (2)    Does the narrow scope of the activity defeat an inference that its primary goal was to encourage a general policy rather than to address a specific proprietary problem?

"If the answer to either question is 'yes,' the governmental entity is acting as a market participant." *Id.* The court explained that, as the operator of LAX, the city had an interest in avoiding the disruptive effects of strikes, boycotts, and work stoppages, and it was the same interest as one might expect of a private airport operator in the same situation. *See id.* at 1080-82. The court also explained that the city's challenged activity had narrow geographical application only to companies that provided services at LAX. *See id.* at 1082-84. Accordingly, the court held that the city "act[ed] as a market participant and not a regulator" in requiring the airline-service companies to agree to limit their right to engage in coordinated labor action. *Id.* at 1079.

Here, the undisputed facts show that County activity under the Ordinance is proprietary in nature under both parts of the *Cardinal Towing* test. First, County activity is undertaken in pursuit of the same kind of interest that one might expect businesses to pursue in the same situation: safety. Just as the city in *Airline Service Providers* shared the same interest in avoiding work stoppages as might be expected of a private airport

20

operator, the County shares the same safety interest as would be expected of private owners of real property in ensuring that traffic over the property is safely directed when its normal flow is disrupted. Second, the Ordinance has only narrow geographical application to County-maintained roads. Ex. E Ordinance at 2 (§ 2(a)(i)) (so defining the term "Highway"). Both the County and Plaintiff share this understanding in practice. *See* Ex. J, Pasumarthi Depo. at 25:13-26:9; Ex. F, Olomi Depo. at 89:15-21. Hence, the Ordinance is not preempted because it falls into the proprietary-activity exception.

Plaintiff has previously argued that the County's activity under the Ordinance cannot qualify for this exception because (1) the County's relevant property rights are more limited in certain ways by state law than the property rights of private-property owners, and (2) because Plaintiff, as a part of the telecom industry, has a statutory right to access the right-of-way. *See* Dkt. 9, Opposition to Motion to Dismiss at 11-13 (citing Cal. Pub. Util. Code § 7901). But, in reality, the County's property rights are accorded special recognition by state law. *See* Cal. Pub. Util. Code § 7901.1 (recognizing a municipal "right to exercise reasonable control as to the time, place, and manner in which roads . . . are accessed."); Cal. Str. & Hwy. §§ 1460 (authorizing counties to issue permits and criminalizing encroachment and other activities without a permit), 1461 (providing that acts done under the authority of a permit shall be done according to its terms and conditions). And Plaintiff's state-law right to access the right-of-way is itself subject to an express qualification that Plaintiff exercise it "in such manner . . . so as not to incommode the public use of the road." Cal. Pub. Util. Code § 7901. Indeed, the Ninth Circuit has rejected the argument that telephone corporations' right to access the right-of-way under Public Utilities Code section 7901 overrides areas over which local government has traditionally exercised control. *See Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 723-26 (9th Cir. 2009) (holding telephone corporation's right to access right-of-way does not deprive city of traditional right to enforce aesthetic requirements). It would be incongruous, then, for Plaintiff's same right

///

to somehow override the County's exercise of its property rights to make considered decisions to ensure safety on its own roads.

**D.      The Ordinance is Valid Because It Is a Minimum Labor Standard.**

      **1.      The Ordinance Affects Worker Compensation in the Same Way Traditional Minimum-Wage Laws Do.**

Plaintiff's sole preemption claim fails as a matter of law because the Ordinance establishes only minimum labor standards, which the NLRA does not preempt. *See Am. Hotel & Lodging*, 834 F.3d at 963, *Metro Life*, 471 U.S. at 747-58; *Fort Halifax Packing*, 482 U.S. at 19-23. As noted, the County has always interpreted the Ordinance's phrase "wage equivalent to the Prevailing Wage" to require minimum total hourly compensation and to be agnostic as to how the compensation is divided as between base money wages and all kinds of fringe benefits. *See* Butler Decl. ¶¶ 8-10. There is no evidence that the County has ever interpreted the Ordinance differently, and there is no reason to disregard its consistent interpretation. *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (government practice is "an important interpretive factor even when the nature or longevity of that practice is subject to dispute").

In practice, the Ordinance's real-world effects on worker compensation have been similar to those of traditional minimum-wage laws. It has boosted compensation where it applies and done very little else. *See, e.g.*, Ex. K, Deposition of Kyle Abney, Person Most Knowledgeable for West Coast Traffic Control, dated Feb. 25, 2025 ("Abney Depo.") at 17:7-14 ("[Q.] And so you're saying that the wage that's now required to be paid is higher than the wage that was previously paid by West Coast? A. Correct. Q. Are there any other effects that the ordinance has on the compensation West Coast provides to its employees? A. No."); Ex. L, Deposition of Annette Requilman, Person Most Knowledgeable for North County Traffic Control, Inc., dated Feb. 27, 2025 ("Requilman Depo.") at 20:12-14 ("[W]e set our wages for the regular rates of pay without consideration to the prevailing wage."); Ex. O, Deposition of Marlene Sanchez, Person Most Knowledgeable for Co's Traffic Control, dated Feb. 25, 2025 ("Sanchez Depo.") at

22

17:10-13 ("Q. Are there any other effects that the ordinance has on the compensation . . . that Co's provides to its employees? A. No.").

Further, the specific concern articulated in *Bragdon* that firms would be pressured to reduce bargained-for fringe benefits did not materialize. *See* Ex. O, Sanchez Depo. at 20:4-10 ("[Q. S]ome criticism of laws like the County's ordinance are that they will affect the distribution of how much is wages, [which] might go up[,] and the amount of those fringe benefits, the[ir] value might be pushed down. Have you observed that happen with . . . Co's employees? A. No."). Indeed, in certain instances the opposite has happened. Three traffic control companies—one union, two non-union—testified that they pay *more* toward fringe benefits to their workers for work performed where the Ordinance applies. *See* Ex. K, Abney Depo. at 19:15-20:6 (health and pension); Ex. L, Requilman Depo. at 18:11-15 (contribution to 401(k)); Ex. N, Deposition of Daniel Friedman, Person Most Knowledgeable for ACME Safety and Supply Corp., dated Feb. 26, 2025, at 29:19-30:5 (vacation).

These undisputed facts show that the Ordinance has a similar effect on worker compensation as traditional minimum-wage laws do: it boosts worker compensation. It does not dictate the results of collective bargaining but rather merely provides a "backdrop" for them that is more favorable to workers regardless of whether they are members of any union. *Am. Hotel & Lodging*, 834 F.3d at 963 (citation omitted).

## 2. The Ordinance Has Not Discernably Affected the Process of Collective Bargaining.

Moreover, the Ordinance has had no discernable effect on the process of collective bargaining. There is no evidence that the process by which CBAs are negotiated in San Diego County has changed or will change after the Ordinance was adopted. Several major CBAs have not been negotiated at all after the Ordinance was adopted due to the periodic schedule of such negotiations (such negotiations last having taken place in 2022 and not to take place again until 2026 or 2027). *See* Ex. P, Ryan Depo. at 38:12-18; Ex. H, Andrews Depo. at 36:12-14. Specifically, the process of negotiating the AGC Master

23

23-cv-00844-JO-BLM

Labor Agreements has not changed since the Ordinance came into effect in 2023. *See* Ex. P, Ryan Depo. at 37:15-20; Ex. S, Macedo Depo. at 33:8-11. One of those Master Labor Agreements even authorizes a committee to recommend modifications to it at any time, but that committee has never met. *See* Ex. P, Ryan Depo. at 40:5-18. And there is no evidence that the process that led to changes in one of SDG&E's CBAs under two Letters of Understanding unfolded any differently than the process that led to the CBA in the first place. *See* Ex. T, Letters of Understanding at 4 ("this LOU is a reflection of good faith"), 16-17 (company and union agreeing "to continue to partner and work cooperatively").

### 3.    *Bragdon* Does Not Control the Outcome of This Case.

*Bragdon* does not stand for a bright-line rule against using a prevailing-wage concept as a point of reference to set a minimum wage. There is no such rule. In *Associated Builders and Contractors of Southern California, Inc. v. Nunn*, 356 F.3d 979 (9th Cir. 2004), the Ninth Circuit held that California's apprentice-prevailing-wage scheme was merely a minimum wage standard "no more preempted than . . . state minimum wage laws generally." *Id.* at 988. Meanwhile, the Second Circuit, in *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015), held that a New York minimum-wage law for home-healthcare aides incorporating a prevailing-wage concept was not preempted because it set minimum labor standards not incompatible with the general goals of the NLRA. *Id.* at 84-87. Indeed, in the 30 years since *Bragdon* was decided, the Ninth Circuit appears to have severely limited and abrogated its holdings:

> Plaintiffs ignore that the Ninth Circuit has retreated from its holding in *Bragdon*, cautioning that it "must be interpreted in the context of Supreme Court authority and [its] other, more recent, rulings on NLRA preemption." [*Nunn*, 356 F.3d at 990]. In *Nunn*, the Ninth Circuit limited *Bragdon* to "extreme situations, when [substantive labor standards] are 'so restrictive as to virtually dictate the results' of collective bargaining." *Id.* [citing *Bragdon*].

> The Ninth Circuit also effectively reversed *Bragdon* to the extent the opinion was based on a concern that the ordinance targeted particular workers. *Id.* The court explained that "[i]t is now clear in this Circuit that state substantive labor standards, including minimum wages, are not invalidated simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." *Id.*

23-cv-00844-JO-BLM

*Associated Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d 810, 823-24 (S.D. Cal. 2017) (formatting altered).

### 4. If *Bragdon* Does Control the Outcome of This Case, then It Should Be Overruled.

If *Bragdon* can still somehow be read to require the Court to invalidate the Ordinance, then *Bragdon* should be overruled. It has at least three major flaws. First, several aspects of it are poorly reasoned. *See Jama v. Golden Gate America LLC*, No. C16-0611RSL, 2016 WL 8738670, at *3-4 (W.D. Wash. Dec. 13, 2016) (criticizing its reasoning along three lines and noting at *4 that its "continuing validity is unclear"). Second, as described immediately above, it is inconsistent with later decisions of the Supreme Court and Ninth and Second Circuits. *See Nunn*, 356 F.3d at 990; *Concerned Home Care Providers*, 783 F.3d 77 at 84-87. Finally, the opinion in *Bragdon* was based on two judges' speculation about one ordinance's potential ramifications. *See* 64 F.3d at 504 (W. Fletcher, J., concurring in the result only). Speculation does not always bear out in practice, and the undisputed facts show that the speculation of the two judges who joined the opinion in *Bragdon* did not bear out in practice in this case.

## V.

## CONCLUSION

For these reasons, Defendants request summary judgment in their favor, or, alternatively, partial summary judgment in their favor as to each of the issues raised by this motion.

Dated: June 2, 2025                          Claudia G. Silva, County Counsel

                                             *s/Austin M. Uhler*
                                             Austin M. Uhler, Senior Deputy
                                             Attorneys for Defendants
                                             Email: austin.uhler@sdcounty.ca.gov

23-cv-00844-JO-BLM