23-cv-00844-JO-BLM

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HP COMMUNICATIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, BOARD OF SUPERVISORS OF COUNTY OF SAN DIEGO, and DOES 1-20,<br><br>Defendants. | Case No.: 23-cv-00844-JO-BLM<br><br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 38] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. 37]** |

Plaintiff HP Communications, Inc. challenged a San Diego County ordinance requiring private employers to pay traffic control workers a prevailing wage. The parties filed cross motions for summary judgment addressing whether this ordinance is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, because it interferes with the collective bargaining process between private employers and the traffic

23-cv-00844-JO-BLM

control workers they hire.  Dkt. 37 ("HP's MSJ"); Dkt. 38 (Defs.' MSJ").[1]  For the reasons below, the Court grants summary judgment in favor of Defendants.

## I. BACKGROUND

HP is a non-union company that installs telephone lines on roads maintained by San Diego County.  HP's MSJ, Ex. 1 & Dkt. 39, Ex. F ("Olomi Dep.") 25:22–25, 98:8–10; HP's MSJ, Ex. 36 ("Olomi Decl.") ¶¶ 2–3.  It primarily does contract work for telecommunications corporations like AT&T, Verizon, and San Diego Gas & Electric ("SDG&E").  *See* Olomi Dep. 25:22–25; Olomi Decl. ¶¶ 2–5.  When working on its projects, HP sometimes utilizes traffic control workers or "flagmen" to redirect the flow of traffic, either drawing from its own employees or outsourcing to traffic control companies.  *See* Olomi Dep. 46:1–47:17, 51:18–22.  As a non-union contractor, HP does not have any ongoing collective bargaining agreements with local unions, nor has it ever negotiated a collective bargaining agreement.  *Id.* 98:10–12, 99:6–8.  On two occasions, it has entered Project Labor Agreements ("PLAs") to allow it to work on projects for companies that require unionized labor.  *Id.* 129:7–18, 132:7–9.  When performing work on projects governed by a PLA, HP's employees temporarily become members of the local union that negotiated the PLA, and HP pays them the wages specified by the PLA.  *Id.* 130:8–17, 139:16–140:14; Dkt. 41-2 ("Olomi Opp. Decl.") ¶ 3.  HP was not involved in negotiating either PLA it entered; the terms of those PLAs were negotiated by the company requiring work and a local union, and HP stepped in to provide labor under the already-negotiated conditions.  Olomi Dep. 131:17–132:6, 137:22–138:6.

In February 2023, the San Diego County Board of Supervisors adopted Ordinance No. 10828 ("the Ordinance"), which set a minimum wage for traffic control workers performing work on private construction projects on County-maintained roads.  San Diego

---

[1]    After the parties filed their respective motions for summary judgment, the Court also granted the State Building and Construction Trades Council of California leave to file an amicus brief in support of Defendants' motion for summary judgment.  Dkt. 42.

County Code of Regulatory Ordinances § 74.301 (added by Ordinance No. 10828 (N.S.), Feb. 8, 2023). By requiring that traffic control workers be paid "a wage equivalent to the Prevailing Wage otherwise owed to persons engaged on a public works or maintenance project for the same or substantially similar work," *id.* § 2(b), the Ordinance effectively increased wages for this sector of workers. *See* HP's MSJ, Ex. 4 ("Abney Dep.") 16:23–17:10, 19:15–23, 20:2–6, 25:1–26:7; HP's MSJ, Ex. 5 ("Sanchez Dep.") 17:19–18:5, 35:10–36:4; HP's MSJ, Ex. 6 & Dkt. 39, Ex. N ("Friedman Dep.") 23:17–25; HP's MSJ, Ex. 7 & Dkt. 39, Ex. H ("Andrews Dep.") 27:6–22, 40:15–41:17; and HP's MSJ, Ex. 8 ("Requilman Dep.") 16:14–21, 22:7–23:6 (testifying that the Ordinance has increased wages). The Ordinance's declared purpose is to "address the unique safety risks confronted by users of County maintained roads subject to traffic control by ensuring that . . . traffic control workers are paid a minimum wage equivalent to the prevailing wage . . . [because] [l]ow wages and difficult working conditions can present a significant risk of harm to users of public streets that can be avoided by ensuring the most qualified workers are retained to provide traffic control work." Ordinance § 1.

Under the Ordinance, employers must pay traffic control workers total hourly compensation, comprised of both wages and benefits, equal to the hourly prevailing wage rate set by California's Department of Industrial Relations ("DIR"). Dkt. 38-4, Declaration of Branden Butler ("Butler Decl.") ¶ 8; *see* CAL. LAB. CODE §§ 1773, 1773.9; *Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 989–90 (9th Cir. 2004), *amended,* No. 02-56735, 2004 WL 292128 (9th Cir. Feb. 17, 2004) (describing DIR's process of calculating prevailing wages).[2] Employers may satisfy this prevailing wage requirement through any combination of base wages and benefits, provided that the total compensation package equals the prevailing wage rate. *Interpipe Contracting, Inc. v.*

---

[2]     The Ordinance requires workers be paid "a wage equivalent to the Prevailing Wage," and defines "Prevailing Wages" as the wages required to be paid under California's Prevailing Wage Statute, CAL. LAB. CODE § 1720 *et seq.  See* Ordinance §§ 2(a)(ii), (b). Those wages, in turn, are set by DIR through the process mandated by the Prevailing Wage Statute.

*Becerra*, 898 F.3d 879, 884 (9th Cir. 2018) (citing CAL. LAB. CODE § 1773.1); CAL. LAB. CODE § 1773.8 (parties may opt out of the base cash wage component by collective bargaining agreement); Butler Decl. ¶ 9 (County interprets the Ordinance to allow parties to pay more or less than base cash wage component set by DIR, so long as total compensation provided is at least equal to the total prevailing wage rate).

The Ordinance mandates compliance with this prevailing wage rate for any work performed on a County-operated road, and gives the Director of the Office of Labor Standards and Enforcement or any other County official authority to enforce it. Ordinance §§ 2(c)–(d). The County intends to enforce the Ordinance by responding to complaints that it receives; it does not affirmatively conduct audits of employer payrolls to ensure compliance and has no plans to do so in the future. Dkt. 39-1, Ex. G ("Butler Dep.") 26:24–27:23.[3] According to the County's website describing the Ordinance's requirements, remedies for an employer's failure to pay the required prevailing wage include "citation[s], civil penalt[ies], [and] injunctive relief (not limited to a stop work order)." HP's MSJ, Ex. 32.

Since the Ordinance has gone into effect, HP's costs for traffic control services have significantly increased. The Ordinance requires HP to pay employees two-and-a-half to three times the rate it previously paid them for traffic control services. Olomi Dep. 46:1–7. For HP, paying its low-level traffic control employees this increased rate means paying them more than the foremen supervising them. *Id.* 46:8–25. To avoid the undesirable employee dynamic that this creates, HP now subcontracts out most of the traffic control work it used to perform in-house. *Id.* 46:8–47:10. Subcontracting has increased HP's costs for traffic control work by 60–130%, making it substantially more expensive for HP to pay for these services on its work sites. *Id.* 47:3–10. HP is also concerned that the Ordinance

---

[3] To date, the County has not received any complaints of noncompliance with the Ordinance. *Id.* 27:24–28:2.

will override wage and benefit terms it could negotiate with unions for any future PLAs it might enter. *See* Olomi Opp. Decl. ¶ 5.

Other union and non-union employers have also had to increase their total compensation to comply with the Ordinance, although they arrive at the total prevailing wage rate in different ways. Some employers have increased both wages and benefits, while others have increased their hourly cash wage but kept their benefits at the same level. Abney Dep. 20:2–6 (non-union employer West Coast Traffic Control, LLC increased wages and benefits to comply with the Ordinance); Friedman Dep. 23:17–25, 29:19–30:5 (union employer ACME Safety and Supply Corp. pays employees more in hourly wages and fringe benefits when the Ordinance applies); Requilman Dep. 16:15–22, 22:7–23:6 (non-union employer North County Traffic Control, Inc. pays employees higher hourly wages when the Ordinance applies, which increases wage-based fringe benefits, but has not changed the amount or type of fringe benefits offered); Andrews Dep. 32:23–33:20 (when the prevailing wage rate includes categories of fringe benefits not required by the union's collective bargaining agreement nor offered by Pro Traffic Services, Inc., Pro Traffic pays the worker additional money wages to cover the difference); Sanchez Dep. 17:14–18:5, 35:11–1 (union employer Co's Traffic Control, Inc. pays normal fringe benefits and additional money wages).

Finally, while the Ordinance has caused the wages in collective bargaining agreements to go up, there is no evidence in the record that it has interfered with the bargaining process itself.[4] Instead, HP argues that these requirements impede the collective bargaining process by imposing such detailed wage and benefit requirements that parties have no room to negotiate labor terms. *See* HP's MSJ at 25.

---

[4] HP points to SDG&E's Letters of Understanding with IBEW Local Union 465 as an example of the Ordinance interfering with the collective bargaining process, but these letters show only that SDG&E agreed to pay IBEW Local Union 465-affiliated workers more to comply with the Ordinance, and IBEW Local Union 465 agreed to accept these negotiated rates. *See* HP's MSJ at 24. HP's briefing points the Court to no other record evidence regarding any impact on the collective bargaining process, as opposed to the resulting increased wages.

23-cv-00844-JO-BLM

On May 5, 2023, HP filed a complaint against the County of San Diego and the San Diego County Board of Supervisors, alleging that the Ordinance was preempted by the NLRA. Dkt. 1. The complaint asserted a single federal preemption claim and sought declaratory and injunctive relief deeming the Ordinance void and enjoining County from enforcing it. *Id.* After the close of discovery, the parties filed cross-motions for summary judgment on HP's NLRA preemption claim. HP's MSJ; Defs.' MSJ. In its motion, HP also raised a state preemption theory for the first time. *See* HP's MSJ at 11–16. At the September 11, 2025 hearing on the parties' cross-motions for summary judgment, the Court ordered supplemental briefing on this newly-raised state preemption theory. *See* Dkts. 55 (HP's Supp. State Preemption Brief), 57 (Defs.' Supp. State Preemption Brief).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial. *Id.* at 322–23. The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, [when she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

### III. REQUEST FOR JUDICIAL NOTICE

HP requests that the Court take judicial notice of various prevailing wage determinations made by DIR, excerpts of the County of San Diego's Salary Schedule, and San Diego County's Office of Labor Standards & Enforcement FAQ Page. Dkt. 37-3. Defendants do not oppose HP's request for judicial notice. Courts may take judicial notice of matters that are not subject to reasonable dispute, including government documents available from reliable sources on the internet, such as websites run by governmental agencies. Fed. R. Evid. 201; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (appropriate to take judicial notice of information on local government website because it was "made publicly available by government entities" and "neither party dispute[d] the authenticity of the web sites or the accuracy of the information displayed therein"); *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies") (quoting Fed. R. Evid. 201). Here, all the documents that HP requests the Court take judicial notice of are official government publications on state and local government websites, and neither party disputes their accuracy. Accordingly, the Court grants HP's request and takes judicial notice of the documents identified in HP's request for judicial notice. Dkt. 37-3.[5]

### IV. EVIDENTIARY OBJECTIONS

Defendants object to (1) testimony from two traffic control companies about the safety of their workers on Ordinance and non-Ordinance jobs; (2) County witness Murali Pasumarthi's testimony about the DIR prevailing wage rate the County uses; (3) DIR

---

[5]    These documents are attached as HP's Exhibits 16, 17, 19–21, 24–32, and 37 to Dkt. 37-4 ("McConnell Decl.").

23-cv-00844-JO-BLM

Research Data Supervisor Michael Morris's declaration about two DIR prevailing wage determinations for San Diego County; and (4) County witness Branden Butler's testimony concerning the contents of DIR's website and its relevance for interpreting the Ordinance. *See* Dkt. 43-3. The Court overrules Defendants' objections to the above testimony as moot because it did not rely on the objected-to evidence in its ruling.[6] *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("Before ordering summary judgment in a case, a district court must . . . rule on evidentiary objections that are material to its ruling.").

## V. DISCUSSION

The Court begins by addressing whether HP may raise its new state preemption argument at this stage in the proceedings. While concluding that it may not, the Court considers, in the alternative, whether HP has raised a triable issue on elements necessary for this argument—i.e., that HP qualifies as a public utility or that this County wage ordinance regulates matters of statewide concern. Finally, the Court turns to the crux of the parties' dispute: whether the Ordinance's prevailing wage requirement is preempted by the NLRA because it interferes with the collective bargaining process.

### A. State Law Preemption

In its motion for summary judgment, HP argues for the first time that the Ordinance is preempted because it regulates safety and wages for public utilities—areas where the State has exclusive regulatory authority. HP's MSJ at 5, 11–16. It may not raise this argument at this late stage because it did not provide Defendants adequate notice of this theory. Courts may only consider a new theory of liability at summary judgment if the facts pled in the complaint are sufficient to give the defendant fair notice of the claim. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086–87 (9th Cir. 2019). In its motion for summary judgment, HP asserts that it is a public utility, and as such, regulation of its wages and safety constitutes impermissible regulation of a public utility.

---

[6]    Based on parties' stipulation at oral argument, the Court takes judicial notice of DIR's website as relevant to understanding how the prevailing wage is calculated.

HP's MSJ at 11–16.  Alternatively, HP argues that because it is a contractor for public utilities and bound by the same state regulations when performing work for them, any regulation of HP is "indistinguishable" from regulation of the public utility itself.  *See id.*; Dkt. 55 at 9–10.  But none of the facts that would give Defendants notice of these arguments are pled in the complaint.  HP did not plead that it was a public utility, nor did it allege what aspects of its work would qualify it as one.  For example, HP did not allege that it provides services or goods to the public directly or indirectly.  *See generally* Compl.; CAL. CONST., Art. XII § III (public utilities include "[p]rivate corporations and persons that own, operate, control, or manage a line, plant, or system for . . . the transmission of telephone and telegraph messages"); CAL. PUB. UTIL. CODE § 216(a) (a "telephone corporation" is a public utility where its "service is performed for, or the commodity is delivered to, the public or any portion thereof"), § 216(c) (a company that performs a service for a telephone corporation also qualifies as a public utility if the telephone corporation in turn provides that service to the public).  HP also failed to plead facts to support its alternate argument based on its work as a contractor for public utilities—for instance, HP did not even allege that the companies it works for are public utilities.  Because these facts are wholly absent from the complaint, they cannot have possibly given "fair notice" to Defendants of the state law preemption argument that HP now raises.[7]

Even if the Court were to permit this belated argument, HP also fails to raise a triable issue on several elements of its claim.  To prevail on a state preemption theory, the party claiming preemption must show that the local legislation (1) conflicts with state law by duplicating, contradicting, or entering an area fully occupied by state law; and (2) regulates a matter of statewide concern.  *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th

---

[7]    HP's belated disclosure of this argument in a confidential settlement discussion that took place after the close of discovery cannot retroactively cure the deficiency of its pleadings.  *See* HP's MSJ at 11 n.1; *Pac. Coast Fed'n of Fishermen's Ass'ns*, 945 F.3d at 1086–87 (factual allegations must be pled in the **complaint** to give fair notice).  Because Defendants had no notice of this argument prior to the close of discovery, they had no opportunity to gather information to rebut it.

893, 897 (1993); *T-Mobile W. LLC v. City & Cnty. of San Francisco*, 6 Cal. 5th 1107, 1116 (2019) ("The party claiming preemption has the burden of proof.").

HP's first argument, that the Ordinance conflicts with state law by regulating public utilities, rests on its assertion that it qualifies as a public utility. But HP offers no evidence to support this assertion. While HP performs work for "telephone corporations" that may qualify as public utilities, HP offers no evidence to support the proposition that it is itself a "telephone corporation." *See* Olomi Decl. ¶¶ 2–5 ("HP's **customers** are telephone corporations") (emphasis added); CAL. PUB. UTIL. CODE § 216(a) (public utilities include "telephone corporation[s]" whose "service is performed for, or [whose] commodity is delivered to, the public or any portion thereof"); Utility Contact System Search, CAL. PUBLIC UTIL. COMM'N, https://apps.cpuc.ca.gov/apex/f?p=102:1::::RP (directory of all telephone corporations in California maintained by the Public Utilities Commission does not list HP)[8]; *see generally* Dkts. 37, 41, 47, 55 (not pointing to any record evidence that HP provides services directly to the public).

HP also argues that it qualifies as a telephone corporation under CAL. PUB. UTIL. CODE § 216(c) because it provides construction services to telephone corporations like Verizon, T-Mobile, and AT&T. *See* Dkt. 55 at 6–7. This argument is flawed. Section 216(c) states that a company that performs a service for a telephone corporation also qualifies as a public utility if the telephone corporation "in turn . . . performs **that** service for . . . the public." (emphasis added). HP provides construction services for its telephone corporation customers, but those telephone corporations do not in turn provide construction services to the public, so CAL. PUB. UTIL. CODE § 216(c) does not render it a public utility.[9]

Nor does HP point to evidence to support its contention that the Ordinance, which sets wages on roads maintained by San Diego County, regulates a matter of statewide

---

[9]   By HP's logic, any vendor or contractor that provided goods or services to a telephone corporation like Verizon—e.g., equipment, supplies, uniforms—would qualify as a public utility.

23-cv-00844-JO-BLM

concern. *See* Dkt. 55 at 12–13 (arguing that prevailing wages of public utilities are a matter of statewide concern but not identifying facts to support claim); *contra State Bldg. & Constr. Trades Council of California v. City of Vista*, 54 Cal. 4th 547, 556 (2012) (holding that "the wage levels of contract workers constructing locally funded public works are a municipal affair . . . and that these wage levels are not a statewide concern").[10] HP's failure to create a triable issue on this required statewide concern element is  fatal under both of its theories—that the Ordinance regulates public utilities directly or that it regulates them by regulating their agents and contractors. *See San Diego Gas & Elec. Co. v. City of Carlsbad*, 64 Cal. App. 4th 785, 793 (1998) ("Where local legislation clearly serves local purposes, and state legislation that appears to be in conflict actually serves different, statewide purposes, preemption will not be found.").

Because HP fails to provide evidence of necessary elements of its state preemption claim, the Court, alternatively, grants summary judgment in favor of Defendants. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982) ("if one party moves for summary judgment and, at the hearing, it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held, the court may sua sponte grant summary judgment to the non-moving party").

---

[10] HP also argues that the safety of public utilities is a matter of statewide concern. *See* Dkt. 55 at 10–12. However, insofar as the Ordinance is a safety measure, HP provides no evidence that it conflicts with state safety laws. Moreover, state law expressly preserves local governments' power to regulate safety measures for public utilities. CAL. PUB. UTIL. CODE § 2902 ("This chapter shall not be construed to authorize any municipal corporation to surrender to the commission its powers of control to supervise and regulate the relationship between a public utility and the general public in matters affecting the health, convenience, and safety of the general public, **including matters such as the use and repair of public streets by any public utility**.") (emphasis added). Because there is no evidence of conflict, this preemption argument fails.

23-cv-00844-JO-BLM

**B. NLRA Preemption**

The Court next turns to HP's argument that the Ordinance is preempted by the NLRA because it interferes with the collective bargaining process.[11]

The NLRA is a federal law that "codifies employees' right to bargain collectively, seeks to equalize bargaining power between employers and employees, and preempts state laws that frustrate the accomplishment of these goals." *Interpipe Contracting*, 898 F.3d at 887. "While the NLRA contains no express preemption provision, two categories of state action are implicitly preempted: (1) laws that regulate conduct that is either protected or prohibited by the NLRA (*Garmon* preemption), and (2) laws that regulate in an area Congress intended to leave unregulated or controlled by the free play of economic forces (*Machinists* preemption)." *Id.* (internal quotations omitted).

*Machinists* preemption "bars states from interfering with the collective bargaining process." *Id.* It focuses on interference with *how* parties negotiate (process), rather than *what* they negotiate (outcomes). *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20–21 (1987) ("the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining"). Thus, for a *Machinists* preemption analysis, the key question is whether the measure alters the mechanics of collective bargaining, such as by restricting economic "weapon[s] of self-help" (like strikes or lockouts) that parties can use to pressure negotiations. *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016); *Interpipe Contracting*, 898 F.3d at

---

[11] The County argues that it was acting as a property owner and not as a regulator when it passed this prevailing wage requirement to ensure the safety of the roads it maintains. *See* Defs.' MSJ at 25 (arguing its "actions were taken in its capacity as the owner of property interests in the land where its roads are located.") As such, it invokes the "market participant" exception to argue that NLRA preemption does not apply. *See id.*; *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017) (NLRA preemption does not apply to local government actions taken as a market participant). Because the undisputed evidence shows that the Ordinance contains a civil penalty provision, *see* HP's MSJ, Ex. 32, the Court cannot grant summary judgment for Defendants on the market participant exception. *Airlines for Am. v. City & Cnty. of San Francisco*, 78 F.4th 1146, 1152 (9th Cir. 2023) ("civil penalty provisions alone may amount to the force and effect of law rendering a government entity a regulator rather than a market participant").

23-cv-00844-JO-BLM

888 ("Virtually any labor standard—e.g., wage and hour requirements—will affect the terms of [collective bargaining], but the pertinent question under *Machinists* is whether such a standard interferes with the collective bargaining *process*.") (emphasis in original).

Minimum wage and benefit laws generally do not interfere with the collective bargaining process because they do not alter bargaining mechanics. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985). Even though these laws may change the substantive outcomes of negotiations by setting a higher floor, "they do not regulate the mechanics of labor dispute resolution." *Am. Hotel & Lodging Ass'n*, 834 F.3d at 963; *Interpipe Contracting*, 898 F.3d at 888 ("Minimum labor standards will necessarily affect employer-employee relations by . . . setting the statutory baseline [] for collective bargaining negotiations . . . But such *effects* differ in kind from a State's regulation of the bargaining process itself.") (emphasis in original). This is true even though these laws "technically interfere with labor-management relations," "give[] employees something for which they might otherwise have had to bargain," and impact labor and management unequally. *Am. Hotel & Lodging Ass'n*, 834 F.3d at 963–64 (citing *Metro. Life*, 471 U.S. at 757; *Fort Halifax*, 482 U.S. at 2–3).

Over thirty years ago, the Ninth Circuit recognized one potential exception to this rule: a minimum wage and benefit requirement could interfere with the collective bargaining process by setting substantive labor terms so exhaustive that they leave nothing to bargain over. *See Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995). In *Bragdon*, the Ninth Circuit struck down a Contra Costa County ordinance requiring the payment of "prevailing wages," as defined by California's Prevailing Wage Statute, because, among other things, it "affect[ed] not only the total of the wages and benefits to be paid, but also the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits for the worker." *Id.* at 502.

However, since then, the Ninth Circuit has upheld numerous prevailing wage measures, confirming that its holding in *Bragdon* is a narrow exception to the general rule

23-cv-00844-JO-BLM

that minimum labor standards do not interfere with the collective bargaining process. *Dillingham Const. N.A., Inc. v. Cnty. of Sonoma*, 190 F.3d 1034, 1039-41 (9th Cir. 1999) (prevailing wage statute "d[id] not affect the collective bargaining process" because it neither "encourage[d] nor discourage[d] the collective bargaining process"); *Nunn*, 356 F.3d at 991 (statute requiring the payment of prevailing wages to apprentices on public and private projects was "not so restrictive as to interfere with the collective-bargaining process"); *Interpipe Contracting*, 898 F.3d at 891 (confirming that minimum labor standards that are "unrelated in any way to the *processes* of bargaining or self-organization" are not preempted) (alterations and italics in original) (quoting *Metro. Life*, 471 U.S. at 756).

In sum, the Ninth Circuit recognizes two ways that a law can be preempted for interfering with the collective bargaining process: (1) if it directly interferes with the mechanics of bargaining, such as by restricting "weapons of self-help" that parties use to pressure negotiations, *see Am. Hotel & Lodging Ass'n*, 834 F.3d at 963; or (2) if it sets terms that are so restrictive that they prevent collective bargaining from happening, *see Bragdon*, 64 F.3d at 504.

Here, HP rests its argument exclusively on the latter ground, but it offers no evidence that the Ordinance is so restrictive that it prevents collective bargaining.

First, the prevailing wage required by the Ordinance lacks the key feature that the *Bragdon* Court found overly restrictive: it does not require a particular allocation between wages and benefits. At the time *Bragdon* was decided, California's Prevailing Wage Statute required not only a total prevailing wage rate (cash plus benefits) but also required employers to pay a certain base cash component, regardless of how much they paid in benefits. *See Bragdon*, 64 F.3d at 500, 502–03. This led the *Bragdon* court to be concerned that contractors and employees would "reduce the benefit package and increase the hourly wages" to meet both the required base cash component and the total wage requirement, essentially leaving them nothing to bargain over. *See id.* However, in 2012, California amended its Prevailing Wage Statute so that parties may now opt out of the base wage

component by collective bargaining agreement.  *See* CAL. LAB. CODE § 1773.8.  By requiring employers to pay a wage "equivalent to the Prevailing Wage" under the current Prevailing Wage Statute, the Ordinance only requires employers to pay the total prevailing wage rate set by DIR, but allows employers, unions, and employees the flexibility to negotiate how to apportion wages and benefits to reach that total.  *See* Ordinance §§ 2(a)(ii) (requiring employers to pay a wage "*equivalent* to the Prevailing Wage" set by DIR) (emphasis added); Butler Decl. ¶¶ 8–9 (County interprets Ordinance to require the total prevailing wage rate set by DIR and does not interpret Ordinance to require base cash wage component).

HP argues that the "Right-of-Way Done Right FAQ" page on the County's website shows that the Ordinance dictates a specific allocation between of wages and benefits.  Dkt. 41 at 23–24; HP's MSJ, Ex. 32.  This webpage, however, merely explains what the Ordinance is and specifies the current prevailing wage rates for traffic control workers:

In the footnotes, the FAQ further breaks down how the prevailing wage rates are calculated by DIR:

Although DIR shows the components it uses to calculate the prevailing wage rate, it does not require employers to pay each component to satisfy the prevailing wage rate.  DIR abandoned that "line-by-line" approach in 1989, after the Ninth Circuit found that it was preempted by the Employee Retirement Income Security Act of 1974 ("ERISA").  *WSB Elec., Inc. v. Curry*, 88 F.3d 788, 791 (9th Cir. 1996) (DIR "no longer consider[s] each

benefit separately"). Under the current approach, DIR sets a total prevailing wage rate, and an employer may satisfy that rate by "add[ing] the hourly cash wage paid plus the total amount of employer contributions to benefits plans . . . If this sum falls short of the prevailing wage, then the employer must make up the difference in cash." *Id.*; *see also Interpipe*, 898 F.3d at 884 ("In satisfying the prevailing wage, employers can either pay all cash wages or pay a combination of cash wages and benefits . . . employer payments [toward benefits] are a credit against the obligation to pay the general prevailing wages.") (cleaned up). Contrary to HP's arguments, the FAQ page simply shows how DIR arrived at the total prevailing wage rate and how *it* priced the separate components; it does not require employers to reach the total in the same way.

Second, the undisputed facts also show that the Ordinance has not dictated a specific allocation between wages and benefits in practice. Employers have adopted a variety of wage and benefit packages to ensure that they are paying total compensation equal to the prevailing wage rate. Some have increased both wages and benefits. Abney Dep. 20:2–6; Friedman Dep. 23:17–25, 29:19–30:5. Others have increased their base hourly pay rate, but not their benefits, except insofar as benefits are based on hourly pay rate. *See* Requilman Dep. 16:15–22, 22:7–23:6. And others have not adjusted benefits at all, electing to meet the prevailing wage rate through higher cash wages. Andrews Dep. 32:23–33:20; Sanchez Dep. 17:14–18:5, 35:11–1. No contractors testified that they believed the Ordinance required specific pay and benefit allocations, or that they believed they had to offer certain benefits to comply with the Ordinance.

At bottom, HP has offered no evidence that the Ordinance has prevented collective bargaining through the exhaustiveness of its requirements. Accordingly, HP has failed to carry its burden of raising a triable issue of fact over whether the Ordinance interferes with the collective bargaining process, and Defendants are entitled to summary judgment.[12]

---

[12]    Because HP has not raised a triable issue of fact over whether the Ordinance interferes with the collective bargaining process, the Court declines to reach Defendants' argument that HP is barred from

23-cv-00844-JO-BLM

# VI. CONCLUSION AND ORDER

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment [Dkt. 38] in full; and DENIES HP's motion for summary judgment [Dkt. 37].

**IT IS SO ORDERED**.

Dated:  February 23, 2026

_____
Honorable Jinsook Ohta
United States District Judge

---

bringing this claim because its injuries do not fall within the zone of interests that the NLRA is designed to protect.

23-cv-00844-JO-BLM